UNITED STATES DISTRICT COURT
District of Maine

| | |
|---|---|
| MONICA CURRIER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. 04-94-B-W |
| v. ) | |
| ) | |
| TOMMY G. THOMPSON, Secretary of ) | |
| the United States Department of Health ) | |
| and Human Services ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER
REVERSING ADMINISTRATIVE DECISION**

The Plaintiff, Monica Currier, is afflicted with macular degeneration and seeks payment under Medicare for a video monitor (VM) to aid her sight. The Secretary of Health and Human Services (the Secretary) contends the VM is not covered under the statute, because it is subject to the eyeglass exclusion. This Court concludes a VM is not excluded from Medicare coverage by the "eyeglasses" provision of 42 U.S.C. § 1395y(a)(7); however, because the Secretary has not ruled finally on whether the VM is otherwise reimbursable, this Court remands the matter to the Secretary for further proceedings.

**I. STATEMENT OF FACTS**

Macular degeneration is a degenerative condition of the area of the retina called the macular, which controls central vision. Administrative Record (A.R.) at 138-40. This pernicious condition can cause blurring or blank spots except in peripheral vision. *Id.* There is no known cure. *Id.* at 40, 119, 126. Unfortunately, Ms. Currier not only has late stage "dry" macular degeneration, she also has undergone a failed corneal transplant in her right eye, further

compromising her sight. *Id*. at 22, 40. In 1997, when she purchased the VM, her eyesight was limited to hand motions in her right eye and was 20/200 in her left eye.[1] *Id*. at 40.

Before purchasing the VM, Ms. Currier received prescriptions for and instructions in the use of magnifying reading glasses and hand-held magnifiers. *Id.* at 120. However, these conventional low vision aids provided only a small viewing area at the level of magnification Ms. Currier required and their benefit proved limited. *Id.* She was compelled to rely on her roommate for most reading tasks, and her independence was compromised. *Id*. Upon prescription by Dr. Charles M. Zacks, she purchased a VM on December 17, 1997. *Id.* at 51, 125. A VM combines a camera and video monitor to create an enlarged image of printed text. *Id.* at 70. It also places white letters over a black background, which eases reading for those sensitive to glare or strong light. *Id.* The VM significantly ameliorated the egregious effects of Ms. Currier's macular degeneration, allowing her to read the labels on prescriptive medications, recipes, and financial documents and to perform activities of daily living. *Id.* at 120. As a consequence, she has been able to move into an apartment on her own and has regained her privacy and independence. *Id.*

Ms. Currier submitted a bill to Medicare for the cost of the VM; however, the Medicare carrier denied her claim both on initial review and reconsideration.[2] *Id*. at 4. She requested a

---

[1] Unfortunately, her eyesight seems to have deteriorated since 1997. In 2001, Dr. Beale, an optometrist, testified Ms. Currier's vision was 20/1200 in her right eye and 20/700 in her left eye. A.R. at 138.

[2] Part B benefits, which cover physician and other services, are administered by insurance carriers pursuant to agreements entered into with the Secretary. *See* 42 U.S.C. § 1395u. In this case, the carrier was United Healthcare Insurance Company. A.R. at 105-06. Pursuant to statutory authority, the carrier has the responsibility to determine whether to pay for items under Part B requirements. § 1395u. Ms. Currier's original claim was denied on June 10, 1998. A.R. at 105. She appealed the denial on December 4, 1998, and the Review Department denied her appeal on January 29, 1999. *Id.* She appealed the Review Department's denial of her appeal to the carrier's Medicare Hearing Officer, who conducted a Fair Hearing on September 29, 1999 and affirmed the Review Department's denial on October 8, 1999. *Id.* at 89-92.

hearing before an Administrative Law Judge (ALJ), which was held on January 16, 2001.[3]  *Id.* at 4, 127-75.  On October 26, 2001, ALJ Dawn Lieb concluded the VM was not covered by Medicare, because it did not meet the definition of prosthetic device and is not customarily used for a medical purpose.  *Id.* at 53-54.  Ms. Currier appealed ALJ Lieb's decision to the Medicare Appeals Council,[4] and on December 8, 2003, the Appeals Council gave her notice of its proposed decision and twenty days within which to respond.  *Id.* at 11-18.  The Appeals Council preliminarily concluded the VM was not covered by Medicare, because it fell within the statutory exclusion for eyeglasses.  *Id.* at 13-18.  The Appeals Council's proposed decision became final and subject to judicial review on March 30, 2004.[5]  *Id.* at 1-8.

## II. STATUTORY AND REGULATORY BACKGROUND AND THE ADMINISTRATIVE RATIONALES

### A.  The Medicare Act:  An Overview

#### 1.  Statutory and Regulatory Inclusions

Enacted in 1965, the Medicare Act, 42 U.S.C. § 1395 *et seq.* established a national program of health insurance for the aged and disabled.  This case concerns Part B of Medicare, which provides coverage for "medical and other health services."  *Id*. § 1395k(a)(1).  Under this general definition, the statute establishes certain benefit categories, including "durable medical equipment" (DME) and "prosthetic devices (other than dental) which replace all or part of an internal body organ."  *Id*. §§ 1395x(s)(6), (8).

There is no specific statutory definition of DME, but the law lists examples, such as "iron lungs, oxygen tents, hospital beds, and wheelchairs . . . used in the patient's home."  *Id*. §

---

[3] At the time of her request, a beneficiary could appeal a carrier's denial of a Part B claim to an ALJ, if the amount in controversy was at least $500.00.  42 U.S.C. § 1395ff.
[4] The Medicare Appeals Council had jurisdiction, because the amount-in-controversy was at least $1,000.00.  *Id*.
[5] Following notice of the proposed decision, Ms. Currier initially requested oral argument, but she withdrew her request on February 27, 2004.  A.R. at 9.

1395x(n). Medicare regulations define DME as equipment that (1) can withstand repeated use; (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury; and, (4) is appropriate for use in the home. 42 C.F.R. § 414.202.

The statute also fails more fully to define prosthetic device. However, Medicare regulations state that "prosthetic and orthotic devices" include "[d]evices that replace all or part of an internal body organ" and "[o]ne pair of conventional eyeglasses or contact lenses furnished subsequent to each cataract surgery with insertion of an intraocular lens." *Id.*

### 2. Statutory and Regulatory Exclusions

The statute expressly excludes coverage for certain specified items:

> (a) Items or services specifically excluded
>
> Notwithstanding any other provision of this subchapter, *no payment may be made* under . . . part B of this subchapter for any expenses incurred for items or services—
>
> . . . .
>
> (7) where such expenses are for routine physical checkups, *eyeglasses* (other than eyewear described in section 1395x(s)(8) of this title)[6] or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, procedures performed (during the course of any eye examination) to determine the refractive state of the eyes, hearing aids or examinations therefor, or immunizations (except as otherwise allowed under section 1395x(s)(10) of this title and subparagraph (B), (F), (G), (H), or (K) of paragraph (1). . . .

§ 1395y(a)(7)(emphasis and footnote added). In defining prosthetic and orthotic devices, the regulations also provide an exclusion for "[i]ntraocular lenses." § 414.202.

---

[6] The regulatory language in 42 C.F.R. § 414.202 quoted earlier tracks 42 U.S.C. § 1395x(s)(8), which allows payment for "one pair of conventional eyeglasses or contact lenses furnished subsequent to each cataract surgery with insertion of an intraocular lens."

### B. The Administrative Decisions

#### 1. The ALJ Decision: October 26, 2001

ALJ Lieb concluded there is "no doubt that Ms. Currier needs the closed circuit television in order to conduct her everyday life." A.R. at 44. Nevertheless, she commented:

> Medicare distinguishes between vision enhancing devices that are prosthetic, and those that are not. Thus, lens that restore the vision provided by the crystalline lens of the eye because of surgical removal or congenital absence are covered. However, low vision aids are not covered items. These are aids used to maximize residual vision rather than replace "all or part of an internal body organ" and therefore do not meet the definition of a prosthetic device.

*Id.* In reaching this decision, she cited the DMERC Supplier Manual section 18.4 (July 1995). *Id.* She concluded "this type of device, useful as it may be, does not replace a missing or malformed body part, and it is not customarily used for a medical purpose." *Id*. She, therefore, determined payment may not be made under Part B.

#### 2. The Medicare Appeals Council Decision: March 30, 2004

The Appeals Council did not reach the question of whether the VM was a prosthetic or durable medical device. Instead, it rested its denial on the eyeglass exclusion under Social Security Act, § 1862(a)(7), as amended, 42 U.S.C. § 1395y(a)(7). It reviewed dictionary definitions of "eyeglass" and noted that they include not only "[g]lasses for the eyes," but also lenses at the eye end of an optical instrument, such as a telescope. A.R. at 5-6. Distinguishing eyeglass from eyewear, the Appeals Council concluded that the VM "relies on a lens in the same way that eyeglasses do, despite the addition of television technology." *Id.* at 8.

### III. STANDARD OF REVIEW

42 U.S.C. § 1395ff(b)(1)(A) provides for judicial review of a final decision by the Secretary denying Medicare benefits in accordance with 42 U.S.C. § 405(g). The Secretary's

decision may be overturned only if "it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law." *Chipman v. Shalala,* 90 F.3d 421, 422 (10th Cir. 1996)(citation and internal punctuation omitted). "Arbitrary and capricious review requires the court to consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *McDonnell Douglas Corp. v. United States Dep't of Air Force,* 215 F. Supp. 2d 200, 204 (D.D.C. 2002)(citations and internal punctuation omitted), *aff'd in part, rev'd in part*, 375 F.3d 1182 (D.C. Cir. 2004). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Clean Harbors Env't Servs., Inc. v. Herman,* 146 F.3d 12, 21 (1st Cir. 1998).

This Court's proper analytic process for interpreting a statute is set forth in *Stowell v. Secretary of Health and Human Services,* 3 F.3d 539, 542 (1st Cir. 1993). The "starting point" is the text of the statute. *Id.* Second, if the statutory language does not answer the question, the court may look to legislative history.[7] *Id.* Third, if the statute is silent with respect to a specific question, the courts "frequently afford deference to a plausible construction offered by the agency charged with administering it." *Id.* at 543 (citing *Nat'l R.R. Passenger v. Boston & Me. Corp.,* 503 U.S. 407, 414-15 (1992); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984), *reh'g denied*, 468 U.S. 1227 (1984)). The degree of deference "diminishes as issues become more law-bound and less moored to administrative expertise." *Id.* at 544. However, courts should not "cavalierly discount the value of agency expertise painstakingly garnered in the administration, over time, of programs of remarkable intricacy."

---

[7] Judge Selya cautions, however, that a review of legislative history can have limitations, referring to Judge Wald's quotation of Judge Leventhal, who once observed that citing legislative history is akin to looking over a crowd and picking out your friends. *Stowell v. Sec'y of Health & Human Servs.,* 3 F.3d 539, 543 (1st Cir. 1993)(quoting Patricia J. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983)).

*Id.* More specifically, the First Circuit has suggested that deference to agency expertise is particularly appropriate in the complex field of Medicare. *Id.*; *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992).[8] *Stowell*'s last point is a "subset of [the] third point": whether the agency's interpretation and its impact are consistent with Congress's "likely intent." *Stowell,* 3 F.3d at 544-45.

Each party has moved for judgment on the stipulated administrative record, which includes a transcript of the hearing before ALJ Lieb and the multiple prior administrative decisions. In a case submitted for judgment on a stipulated record, the district court may resolve any "disputed issues of material fact." *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.,* 210 F.3d 18, 31 (1st Cir. 2000), *cert. denied,* 531 U.S. 1014 (2000); *see also Boston Five Cents Sav. Bank v. Sec'y of the Dep't of Hous. & Urban Dev.,* 768 F.2d 5, 11-12 (1st Cir. 1985).[9]

## IV. DISCUSSION

### A. The *Stowell* Analysis

#### 1. Statutory Ambiguity

Using the text of the statute as the "starting point," the first question is whether Congress has "directly spoken to the precise question at issue" and, if so, to give effect to congressional intent. *Chevron,* 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *see also Stowell,* 3 F.3d at 542. Ms. Currier urges this Court to conclude the statutory use of "eyeglass" must be to its common, everyday meaning: glasses worn to

---

[8] *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175 (1st Cir. 1992), quotes the Third Circuit's comment that "[l]egislators and judges are not medical specialists, and for that reason it is necessary that administrative agencies develop and apply medical expertise." *Id.* at 1178 (quoting *Butler County Mem'l Hosp. v. Heckler,* 780 F.2d 352, 356 (3d Cir. 1985)).

[9] Here, there are no disputed issues of material fact. The parties agree Ms. Currier has macular degeneration and the prescription for the VM is appropriate. There are no issues about the cost of the VM or its beneficial effect on Ms. Currier's life.

7

correct nearsightedness, farsightedness or astigmatism. If the term were so restricted, the VM would not be excluded. The Secretary, on the other hand, sees ambiguity in the term, citing dictionaries which contain multiple definitions of "eyeglass," ranging from eyewear to lenses.

The statutory exclusion provides that Medicare reimbursement shall not be provided for "[r]outine physical checkups, eyeglasses (other than eyewear described in section 1395x(s)(8) of this title) or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses." § 1395y(a)(7). Ms. Currier offers a plausible interpretation of this statutory exclusion. The section uses the term "eyeglasses" twice: first, to define excluded devices and second to define excluded eye examinations. In view of its placement in a section addressing routine physical checkups, the statute may be attempting to eliminate Medicare coverage for routine and recurring medical expenses. The phrase, "for the purpose of prescribing, fitting, or changing eyeglasses," also suggests that "the eyeglasses Congress intended were of the kind that are fitted and/or changed periodically," and there is no evidence a VM is fitted, which has an implication of being worn, or changed periodically.

This part of the analysis, however, is not to determine whose interpretation is correct, but whether Congress has "directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842; *see also Stowell,* 3 F.3d at 542. Here, the Secretary has demonstrated the text is ambiguous. The Secretary first cites the varied dictionary definitions of "eyeglass." For example, he points out *Dorland's Illustrated Medical Dictionary* (28th ed. 1994) defines "eyeglass" simply as a "lens for aiding sight" and *Webster's Third New International Dictionary* (1976) includes a secondary definition: "the eyepiece of an optical instrument (as in a microscope of telescope)." Def.'s Mot. and Incorporated Mem. for J. on the Stipulated Administrative R. and in Opp'n to Pl.'s Mot. for J. on the Stipulated Administrative R. (Docket # 16) at 7. Using these definitions,

eyeglasses could include a broad range of lenses, from standard eyewear to low vision devices, including hand-held magnifiers, small telescopes, prisms, and VMs.

Second, the Secretary points to § 1395y(a)(7)'s use of the term "eyewear"—"other than eyewear described in section 1395x(s)(8) of this title"[10]—contending that "the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy,* 322 F.3d 650, 656 (9th Cir. 2003); *see also Lopez-Soto v. Hawayek,* 175 F.3d 170, 173 (1st Cir. 1999). In other words, if eyeglasses, as Ms. Currier claims, are limited to eyewear, why did Congress not use the same term—"eyewear"—throughout the section?

Third, the eyewear exemption under § 1395x(s)(8) reads: "prosthetic devices . . . including one pair of *conventional eyeglasses* or contact lenses furnished subsequent to each cataract surgery with insertion of an intraocular lens." (Emphasis added). The Secretary argues this section establishes that, if Congress had intended to limit the exclusion to "conventional eyeglasses," it would have done so, and its use of the term "conventional" before eyeglasses would have been redundant. *Lopez-Soto,* 175 F.3d at 173 ("[N]o construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous.").

One case, *Collins v. Thompson,* No. 2:03-cv-265-FtM-29SPC, slip op. (M.D. Fla. June 4, 2004),[11] reaches a different result. In *Collins,* Magistrate Judge Chappell wrote that the "language in the statute is not silent as to the term eyeglasses" and that the statute expressly "refers to eyeglasses as eye wear." *Id*. at 4. She concluded that "eyeglasses are eye wear," and she found the language of § 1395x(s)(8) clearly expressed the congressional intent that the exclusion be limited only to eyewear. *Id*. This Court agrees with Magistrate Judge Chappell that

---

[10] As noted in footnote 6, this language refers to eyewear prescribed following cataract surgery.
[11] The District Court accepted the Magistrate Judge's Report and Recommendation. *Collins v. Thompson,* No. 2:03-cv-265-FtM-29SPC, slip op. (M.D. Fla. Jul. 19, 2004).

9

Congress could have intended eyeglasses to be eyewear, but not that the text, standing alone, is so unambiguous that congressional intent is clear.

### 2. Statutory and Legislative History

The second step in the *Stowell* analysis is to review the legislative history. The exclusion for eyeglasses was included in the original Medicare Act in 1965. As originally drafted before enactment, the exclusion read, in pertinent part, as follows: "[N]o payment may be made . . . where such expenses are for routine physical checkups, eyeglasses or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses (including contact lenses), hearing aids or examinations therefor, or immunizations . . . ." S. Rep. No. 89-404 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 2127. The legislative history of the 1965 enactment contains the following comment in the Senate Report:

> Payments would not be made for routine physical examinations or for eyeglasses, hearing aids, or the fitting expenses or other costs incurred in connection with their purchase. The committee bill provides a specific exclusion of routine dental care to make clear that the services of dental surgeons covered under the bill are restricted to complex surgical procedures. Thus, payment would be made under the supplementary plan for the physician's services connected with the diagnosis of a specific complaint and the treatment of the ailment, but a routine annual or semiannual checkup would not be covered. Similarly, the diagnosis and treatment by an ophthalmologist of, say, cataracts would be covered but the expenses of an eye examination to determine the need for eyeglasses and charges for prescribing and fitting eyeglasses or contact lenses would not be covered. Similarly, too, routine dental treatment-- filling, removal, or replacement of teeth or treatment of structures directly supporting teeth-- would not be covered. Neither would payment be made for orthopedic shoes or other supportive devices for the feet.

1965 U.S.C.C.A.N. at 1989-90. The original language, when combined with this comment in the Senate Report, strongly supports Ms. Currier's contention that Congress was distinguishing

between routine expenses, such as annual examinations for prescribing contact lenses, and less routine expenses, such as diagnosis and treatment of cataracts.

The exclusion, as finally enacted, eliminated the reference to "contact lenses," but the language of the statute remained:

> "[N]o payment may be made under . . . part B for any expenses incurred for items or services . . . where such expenses are for routine physical checkups, eyeglasses or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, hearing aids or examinations therefor, or immunizations . . . ."

Pub. L. No. 89-97, tit. XVIII, 79 Stat. 286, 291, sec. 1862(a)(7) (1965).

The text of the original statute, when combined with the legislative history, casts new light on § 1395y(a)(7), at least as first enacted. Subparagraph 7 was clearly directed to annual and routine medical matters, such as physicals, periodic hearing aid checkups, and immunizations. The portion of the subsection addressing eyeglasses is consistent with this underlying intent. Further, the absence of the later parenthetical language on eyewear highlights the fact that there is no comma between "eyeglasses" and "eye examinations for the purpose of prescribing, fitting, or changing eyeglasses." This juxtaposition encourages the conclusion that, as first enacted, Congress used the term eyeglasses in tandem with its exclusion of payment for "prescribing, fitting, or changing." In other words, Medicare would pay neither for glasses nor the examination that prescribed, fitted or changed them. Also, the absence of the term "eyewear" makes it less likely that Congress, as urged by the Secretary, distinguished between eyeglasses in the more general sense and eyewear. Finally, the statutory language jibes with quoted legislative history, which addressed the eyeglasses exclusion in the same context as a routine physical and distinguished more elaborate treatment, such as those involving cataracts.

Assuming the statutory language as originally enacted would include eyeglasses that are worn, but not lenses that are not, the next question is whether the subsequent amendments of § 1395y(a)(7) altered the original meaning. This subsection was first amended in 1968, when the phrase, "procedures performed (during the course of any eye examination) to determine the refractive state of the eyes," was added. Pub. L. No. 90-248, § 128. In 1990, the parenthetical phrase "other than eyewear described in section 1395x(s)(8)" was added. Pub. L. No. 101-508, § 4153(b)(2)(B). This Court could locate no legislative history to explain either amendment. However, the text of each amendment suggests neither was intended to achieve a wholesale revision of the subsection; each amendment only tweaked the exclusion to respond to developments.

The analysis of this case, therefore, stops at the second *Stowell* step. The statutory and legislative history convinces this Court that the subsection's language is, as illuminated by statutory and legislative history, clear and unambiguous. The term "eyeglasses" in § 1395y(a)(7) refers to eyewear, not to VMs. This conclusion is consistent with Magistrate Judge Garcia's decision in *Davidson v. Thompson,* No. CIV 04-32 LFG, slip op. (D.N.M. 2004). In *Davidson,* Judge Garcia concluded that Congress intended to exclude only "'routine eye care'" from Medicare coverage and noted there is "nothing 'routine' about CCTV [another term for VM] technology, and while millions and millions of individuals wear eye glasses and corrective contact lenses, it is safe to say that such is not true of CCTVs." *Id.* at 19. Judge Garcia contrasted the presence of legislative history supporting this conclusion with the absence of any legislative history supporting the Secretary's argument that "Congress was focusing on the 'lens' as the critical factor in determining coverage." *Id.* Because the analysis stops at the second

inquiry, it is unnecessary to venture further and assess the Secretary's construction of § 1395y(a)(7).

### B. Remand or Resolution

The final question is whether, if not excluded under § 1395y(a)(7), this Court should determine if coverage is included for the VM as durable medical equipment or a prosthetic device. The Secretary urges this Court to remand the case to the Appeals Council to determine whether the VM qualifies under either definition. Ms. Currier disagrees and urges this Court to reach the ultimate question of reimbursement. She points out that § 405(g) authorizes this Court to affirm, modify, or reverse the Secretary's decision "with or without remanding the cause for a rehearing."

Here, although ALJ Lieb addressed these issues, the Appeals Council has not. Even though this Court is sensitive to the extraordinary amount of time Ms. Currier has waited for a final determination on reimbursement, this Court is also sensitive to its limited function under § 405(g). *See Rhode Island Higher Educ. Assistance Auth. v. Sec'y, United States Dep't of Educ.,* 929 F.2d 844, 857 (1st Cir. 1991)("[T]he more imbricated a matter, the more cautious a reviewing court should be about attempting to resolve the issue itself, rather than remanding to the agency."); *State of New York ex rel. Holland v. Sullivan,* 927 F.2d 57, 59 (2d Cir. 1991)("The application of an agency's regulation is a task of administration, not litigation."). Because the Secretary has not spoken finally on the issues that could resolve the case, this Court remands the matter to the Secretary for further proceedings.

### V. Conclusion

This Court concludes that the VM purchased by Ms. Currier is not excluded from Medicare coverage under § 1395y(a)(7), and the decision of the Medicare Appeals Council is

REVERSED. The matter is REMANDED to the Secretary for further proceedings consistent with this opinion.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of May, 2005